| | |
|---|---|
| **IN RE DANAHER CORPORATION SHAREHOLDER DERIVATIVE LITIGATION** | Case No. 1:20-cv-02445-TNM (Consolidated with Case No. 1:20-cv-02846-TNM) |

## MEMORANDUM OPINION

It is black letter law that a board of directors manages a corporation's affairs. Derivative suits—when shareholders sue on a corporation's behalf for wrong done to the corporation—therefore impinge on a board's management prerogatives. The demand requirement balances the interests of directors in managing the corporation and the interests of shareholders in challenging abuses that harm it. A shareholder thus properly brings a derivative suit only when the board wrongfully refuses to act itself after the shareholder demands that it do so or when the shareholder is excused from making a demand because the board is too conflicted to act appropriately.

These principles take center stage here. Plaintiffs—some shareholders of Danaher Corporation—sue several of Danaher's directors. They argue that the Defendants falsely represented Danaher as a diverse corporation even though no African American serves on the Board. Defendants move to dismiss primarily because Plaintiffs failed to either make a demand on the Board to bring this suit or to plead with particularity that such demand would have been futile. The Court agrees. The Board—not shareholders—controlled the decision to act, and Plaintiffs thus had to make demand on the Board. Because they did not, the Court will dismiss the case.

# I.

Danaher "designs, manufactures and markets professional, medical, industrial and commercial products and services, with research and development, manufacturing, sales and distribution in 60 countries." Verified Shareholder Derivative Compl. ("Compl.") ¶ 2, ECF No. 1.[1] It is incorporated in Delaware, and its principal offices are in Washington, D.C. *Id.* ¶ 23.

Plaintiff shareholders—City of Pontiac General Employees' Retirement System and Harry Markarian ("Shareholders")—filed this shareholder derivative action against ten members of Danaher's 12-member Board of Directors[2] and Nominal Defendant Danaher (collectively, the "Directors"). *Id.* ¶¶ 22–33; Pls.' Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n") at 8, ECF No. 29.[3] The Complaint acknowledges that Danaher has received "multiple awards and recognitions for diversity," including being recognized on Forbes' list of the Top 200 Best Employers for Diversity in 2018 and 2019. Compl. ¶¶ 54–55. But the Shareholders contend that, because there are no black directors on Danaher's Board, the Directors have falsely represented Danaher as a company that promotes diversity. *See, e.g., id.* ¶¶ 12–13, 53–64. Under the Shareholders' theory, African American representation is the sine qua non of diversity; other racial, ethnic, gender, religious, and socioeconomic backgrounds do not count.

---

[1] By stipulation of the parties, the Court consolidated *City of Pontiac General Employees' Retirement System v. Joyce* (Case No. 20-cv-02445) and *Markarian v. Joyce* (Case No. 20-cv-02846). Min. Order (Oct. 26, 2020). The Shareholders designated the Complaint in Case No. 20-cv-02445 to be operative. Pls.' Designation of Operative Compl., ECF No. 25.

[2] The Directors named in the Complaint include Thomas Joyce, Walter Lohr, John Schwieters, Linda Hefner Filler, Alan Spoon, Teri List-Stoll, Steven Rales, Mitchell Rales, Raymond Stevens, and Elias Zerhouni. Compl. ¶¶ 24–33. Two other directors were on the Board when the Shareholders sued, but the Shareholders did not name them as defendants. *Id.* ¶¶ 34–35.

[3] All page citations refer to the page numbers that the CM/ECF system generates.

In particular, the Shareholders challenge company statements such as "We're passionate about recruiting, developing and retaining the most talented and diverse team possible"; "A diverse and inclusive workforce strengthens Danaher and ensures the best team continues to win"; and "We seek out a wide range of unique experiences, perspectives and talents, ensuring that diverse voices and viewpoints are heard and celebrated." *Id.* ¶¶ 54, 56 (cleaned up).

The Shareholders say that the Board does not have a "policy, formal or informal, with respect to the identification, selection or consideration of specific African American [Board] nominees." *Id.* ¶ 60. They cite Danaher's proxy statements, which—among other things—say that the Board does not have such a policy "with respect to diversity" and that it "does not make any particular weighting of diversity or any other characteristic in evaluating nominees and directors," but "subjectively takes into consideration the diversity . . . of the Board when considering director nominees." *Id.* (cleaned up).

The Complaint raises three claims: (1) breach of fiduciary duty (Count I); (2) unjust enrichment (Count II); and (3) violation of § 14(a) of the Securities Exchange Act and SEC Rule 14a-9 (Count III). *Id.* at 44–46. The Shareholders seek broad relief, including damages and an order directing Danaher to replace three of its current directors with "two African Americans and one other racial minority," "[i]nvest $150 million in economic and social justice programs," and "[f]ill 15% of all new positions in the United States with African Americans." *Id.* at 46–47.

Before the Court is the Directors' motion to dismiss. It is ripe for disposition.[4]

---

[4] The Court has federal question jurisdiction over the § 14(a) claim, 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims, *id.* § 1367. Although the Directors request a hearing, *see* Defs.' Mot. at 1, the Court finds one unnecessary to resolve the motion, *see* LCvR 7(f) ("A party may in a motion or opposition request an oral hearing, but its allowance shall be within the discretion of the Court.").

## II.

The Directors move to dismiss because the Shareholders fail to properly plead demand futility. *See, e.g.*, Defs.' Mem. in Supp. of Mot. to Dismiss Pls.' Verified Shareholder Compl. ("Defs.' Mot.") at 19, ECF No. 27-1. Federal Rule of Civil Procedure 23.1 governs derivative actions. It requires that a complaint "state with particularity": "(A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). While Rule 23.1 provides the pleading standard, state law governs the substance of the demand requirement. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108–09 (1991). The parties agree that Delaware law applies. Defs.' Mot. at 16 n.4; Pls.' Opp'n at 15.

The Directors also move to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See, e.g.*, Defs.' Mot. at 20. To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (cleaned up). A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Given the case's procedural posture, the Court accepts the Complaint's factual allegations as true and construes them in the light most favorable to the Shareholders. *See L. Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017). The Court need not, however, credit "a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (cleaned up). The Court considers "only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice." *Hurd*, 864

F.3d at 678 (cleaned up).  Evaluating a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### III.

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  A stockholder bringing a derivative action "asserts a cause of action belonging to the corporation." *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).  So a derivative action, "[b]y its very nature . . . impinges on the managerial freedom of directors." *Aronson*, 472 A.2d at 811.

The demand requirement flows from this concern.  A shareholder can bring a derivative suit only "where either the stockholder has demanded the directors pursue a corporate claim and the directors have wrongfully refused to do so, or where demand is excused because the directors are incapable of making an impartial decision regarding whether to institute such litigation." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 366–67 (Del. 2006).  In this way, "the demand requirement implements the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders." *Kamen*, 500 U.S. at 101 (cleaned up).

The Shareholders concede that they did not make demand on Danaher's Board, but they argue that it would have been futile.  *See, e.g.*, Compl. ¶ 100.  There are two tests for determining whether a complaint properly alleges demand futility.  *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).  When a decision of the board of directors is the subject of a derivative suit—in other

words, when "claims involv[e] a contested transaction"—the *Aronson* test applies. *Id.* Under it, courts consider "whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814. In contrast, when there is an "absence of board action"—or, put differently, "where the subject of the derivative suit is not a business decision of the board"—the *Rales* test applies. *See Rales*, 634 A.2d at 933–34.

The parties apparently agree that *Rales* applies here. *See, e.g.*, Pls.' Opp'n at 35; Defs.' Reply in Supp. of Mot. to Dismiss Pls.' Verified Shareholder Compl. ("Defs.' Reply") at 11, ECF No. 30. Indeed, the *Aronson* test would be inappropriate because, as the Delaware Supreme Court explained, "[t]he absence of board action . . . makes it impossible to perform the essential inquiry contemplated by *Aronson*—whether the directors have acted in conformity with the business judgment rule in approving the challenged transaction."[5] *Rales*, 634 A.2d at 933.

Under *Rales*, demand is considered futile if a complaint alleges particularized facts that "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* at 934. Courts typically consider first "whether any directors were interested." *McElrath v. Kalanick*, 224 A.3d 982, 991 (Del. 2020). If any directors were interested, then "the court considers whether any other directors were not independent of an interested director." *Id.*

---

[5] Any daylight between the two tests here would not change the outcome. *Cf. Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 67 n.131 (Del. Ch. 2015) (explaining that "although the *Rales* test looks somewhat different from *Aronson,* in that it involves a singular inquiry, that singular inquiry makes germane all of the concerns relevant to both the first and second prongs of *Aronson*" (cleaned up)).

The main issue here is whether the Directors were conflicted, or "interested." "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders" or "where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales*, 634 A.2d at 936. A director can also be interested if "she would face a substantial likelihood of personal liability for the conduct alleged in the complaint." *McElrath*, 224 A.3d at 991; *see also Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007) ("Directors who are sued have a disabling interest for pre-suit demand purposes when the potential for liability is not a mere threat but instead may rise to a substantial likelihood." (cleaned up)). The Shareholders latch on to the latter theory. They argue that the Directors are interested (and demand is therefore excused) because they "each face a substantial likelihood of liability." Compl. ¶ 95; *see also* Pls.' Opp'n at 35–37 (arguing the same).

Whether directors face a substantial likelihood of liability can depend in part on whether a company's charter limits director liability. "Where directors are contractually or otherwise exculpated from liability for certain conduct, then a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts." *Wood*, 953 A.2d at 141 (cleaned up). Danaher's charter shields the Directors from duty of care claims, but not duty of loyalty claims. *See* Defs.' Mot. at 22 n.7; Pls.' Opp'n at 34–35; *see also Stone*, 911 A.2d at 367 (explaining that a provision such as Danaher's "can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty"). Plaintiffs allege only duty of loyalty claims. *See* Pls.' Opp'n at 34–35; Defs.' Reply at 9.

When claiming that directors are interested, "a derivative complaint must plead facts *specific to each director*, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand." *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007); *see also In re Facebook, Inc. S'holder Derivative Priv. Litig.*, 367 F. Supp. 3d 1108, 1123–24 (N.D. Cal. 2019) (quoting *Desimone* and explaining that "[d]emand futility is assessed on a director-by-director basis"). The Complaint alleges that there are 11 directors on Danaher's Board, but it also suggests that there are 12.[6] Compl. ¶¶ 24–35, 85. Either way, the Shareholders must show that at least six were interested to properly plead demand futility.

The Delaware Supreme Court has recognized that "directors are entitled to a *presumption* that they were faithful to their fiduciary duties" and so, "[i]n the context of presuit demand, the burden is upon the plaintiff in a derivative action to overcome that presumption." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048–49 (Del. 2004). The D.C. Circuit has likewise acknowledged that "the Delaware precedents on demand futility make clear that the bar is high, the standards are stringent, and the situations where demand will be excused are rare." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. ex rel. Fed. Nat. Mortg. Ass'n v. Raines*, 534 F.3d 779, 782–83 (D.C. Cir. 2008) (Kavanaugh, J.), *abrogated on other grounds by Lightfoot v. Cendant Mortg. Corp.*, 137 S. Ct. 553 (2017).

With these principles in mind, the Court turns to the Shareholders' claims. The Court considers whether the Shareholders have adequately shown demand futility as required by Rule

---

[6] The Directors say that 12 directors were on the Board when the Shareholders sued; but as they acknowledge, any difference is immaterial. *See* Defs.' Mot. at 17–18 & n.6.

23.1 for each of their claims: (A) breach of fiduciary duty; (B) unjust enrichment; and (C) a violation of § 14(a) of the Exchange Act and SEC Rule 14a-9. *See* Compl. ¶¶ 101–14.

## A.

In Count I, the Shareholders assert that "Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor." *Id.* ¶ 103. The parties' briefing clarifies that the Shareholders press only a violation of the duty of loyalty. *See, e.g.*, Pls.' Opp'n at 34–35 (stating that the Complaint "pleads only non-exculpable claims" for the breach of the duty of loyalty). More specifically, the Shareholders contend that the Directors breached the duty of loyalty because they "misrepresented and omitted the material facts regarding Danaher's commitment to diversity at all levels of [its] business" and "publicly feigned support for diversity to garner diversity awards, but failed to disclose that ethnic diversity ends at the doorstep to Danaher's Board." *Id.* at 21, 36; *see also* Compl. ¶¶ 101–05.

The Shareholders point to diversity-related statements on the company's website, in its annual report, and in its 2018 corporate sustainability report, including:

- We're passionate about recruiting, developing and retaining the most talented and diverse team possible.
- Our efforts around diversity and inclusion are among the important drivers of associate engagement, and we have made good progress on these fronts: over the last five years, our associate engagement score is up more than 2,000 basis points.
- We have made tremendous progress toward this goal [of a better stronger Danaher] and are honored to be recognized as one of the Top 200 Best Employers for Diversity by Forbes. We are committed to improving on these initiatives and metrics over time so that we can continue to build an inclusive and fulfilling workplace for our associates.
- Our Associate Resource Groups (ARGs) create opportunities for underrepresented individuals including women and people of color to connect personally and collaborate professionally – all in the spirit of achieving their highest potential. And we are honored to have been named to Forbes' list of Best Employers for Women (2019) and Best Employers for Diversity (2018 & 2019).

- A diverse and inclusive workforce strengthens Danaher and ensures the best team continues to win. We are working to support an inclusive culture in which every associate feels they belong . . . .
- We seek out a wide range of unique experiences, perspectives and talents, ensuring that diverse voices and viewpoints are heard and celebrated.

Compl. ¶¶ 54, 56 (cleaned up).

The parties disagree over what standard applies to the duty of loyalty claim. The Directors argue that the crux of the Shareholders' claim is that the Directors failed to exercise proper oversight in preventing the company from issuing false statements and thus the standard of *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996) applies. *See* Defs.' Mot. at 20–21; *see also Stone*, 911 A.2d at 370 ("*Caremark* articulates the necessary conditions predicate for director oversight liability"). This is a plausible reading of the Complaint. *See, e.g.*, Compl. ¶ 103 (alleging breach of various duties, including "oversight").

The Shareholders counter that this case is not about employee oversight liability, but "rather it is built on Defendants' personal acts and omissions." Pls.' Opp'n at 20 (cleaned up). They cite authorities suggesting that their fiduciary duty claim is more properly analyzed as alleging violations of the obligation of the Board to communicate honestly with shareholders. *See, e.g.*, *id.* at 16–17 & nn.12–13. They may be right. The problem, though, is that the Shareholders have not shown a substantial likelihood of personal liability under either standard.

Under the *Caremark* framework, the Shareholders must show that either "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370. "In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations." *Id. Caremark* claims

are "rooted in concepts of bad faith; indeed, a showing of bad faith is a *necessary condition* to director oversight liability." *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017) (cleaned up); *see also id.* ("Because of the difficulties in proving bad faith director action, a *Caremark* claim is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." (cleaned up)).

Plaintiffs cite the fiduciary duty of directors "to deal with their stockholders honestly." *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998); Pls.' Opp'n at 16–17 & nn.12–13. "When a Delaware corporation communicates with its shareholders, even in the absence of a request for shareholder action, shareholders are entitled to honest communication from directors, given with complete candor and in good faith." *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007). In other words, "directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty." *Malone*, 722 A.2d at 10. Directors violate this duty when, even with no shareholder action, they "deliberately misinform[] shareholders about the business of the corporation, either directly or by a public statement." *Id.* at 14; *see also Dohmen v. Goodman*, 234 A.3d 1161, 1168–69 (Del. 2020) ("[T]o state a claim for breach of fiduciary duty in this context, the directors must have knowingly disclosed false information. By requiring scienter, we have sought to distinguish innocent or negligent disclosure violations from those involving an intent to mislead stockholders." (cleaned up)).

Under either standard, then, the Shareholders must show that the Directors face a substantial likelihood of personal liability for knowingly violating their fiduciary duty. Despite their differences, the parties seem to agree on this. *See* Pls.' Opp'n at 23, 25–26, 35–36; Defs.' Reply at 12. But the Shareholders have not shown demand futility because they have not alleged with particularity that the challenged statements are false. Even if the Shareholders had made

that showing, they also have not alleged specific facts connecting the Directors to the statements or facts showing that the Directors acted intentionally.

**1.**

For starters, the Shareholders have not properly alleged that any of the cited statements were false. While the Shareholders do not address the alleged falsity of each statement in detail, they argue that the statements together are false or misleading because there are no African American directors on Danaher's Board. *See, e.g.*, Compl. ⁋⁋ 53, 55; Pls.' Opp'n at 26 (explaining that the statements were "materially false and misleading when made" because "the Danaher Board had zero black directors, and has not had a black director since at least 2015"). This argument fails for the simple reason that most of the statements at issue do not apply to the Board or imply that the Board is diverse. Instead, the statements refer to "*associate* engagement," a "workplace for our *associates*," "*Associate* Resource Groups," and "[a] diverse and inclusive *workforce*." Compl. ⁋⁋ 54, 56 (cleaned up and emphasis added). If a basketball coach says that his players "are in top physical condition," the coach is not also suggesting that he is in great shape.

Just so here. Statements about the diversity of Danaher's *workforce* say nothing about the diversity of the *Board*. Indeed, an affirmation of one thing—here, the employees' diversity—often implies the negation of another—the employers' diversity. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 428 (2012) (defining "[t]he the linguistic canon *expressio unius est exclusio alterius*" as "[t]he expression of one thing is the exclusion of another"); *id.* at 107 (explaining that "[w]e encounter the [*expressio unius*] device— and recognize it—frequently in our daily lives," such as "[w]hen a car dealer promises a low

financing rate to 'purchasers with good credit,' [and] it is entirely clear that this rate is *not* available to purchasers with spotty credit").

More, the Complaint itself admits there was no such misrepresentation. The proxy statements cited by the Shareholders convey that the Board has no strict diversity requirements. *See* Compl. ¶ 60. The proxy statements explain that the Board "believes that [it], taken as a whole, should embody a diverse set of skills, knowledge, experiences and backgrounds appropriate in light of the Company's needs." *Id.* (quoting 2016–2020 proxy statements). But they clarify that "[t]he Board does not have a formal or informal policy with respect to diversity"; that "[t]he Board does not make any particular weighting of diversity or any other characteristic in evaluating nominees and directors"; and that, instead, the Board "takes into consideration the diversity (with respect to race, gender and national origin) of the Board when considering director nominees." *Id.* (cleaned up) (quoting 2016–2020 proxy statements). The Shareholders thus bemoan that the "Company's Proxy Statements convey an *explicit absence* of intention to build a diverse Board." *Id.* (emphasis added). How could anyone be misled given these "explicit" statements?

The Shareholders fare no better as to statements that could be read as applying to the Board as well as the workforce—for example, that the company "seek[s] out a wide range of unique experiences, perspectives and talents, ensuring that diverse voices and viewpoints are heard and celebrated." *Id.* ¶ 56 (cleaned up). That there are no African Americans on Danaher's Board does not inherently mean that the Board is not diverse. The Board could be racially diverse in other ways. And there are other types of diversity besides racial diversity. While the

Court must accept the Shareholders' well-pled allegations as true, the Court rejects their cramped and archaic understanding of diversity.[7]

**2.**

More still, even if the Complaint properly alleged false statements, it lacks well-pled allegations that each Defendant was involved with the statements or acted with scienter. *See Desimone*, 924 A.2d at 943 ("a derivative complaint must plead facts *specific to each director*"). The Shareholders allege that the Directors "intentionally or recklessly caused the Company to disseminate to Danaher shareholders materially misleading and inaccurate information." Compl. ¶ 104. But these allegations are inadequate. "Pleading that the director defendants 'caused' or 'caused or allowed' the Company to issue certain statements is not" particularized enough to excuse demand. *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 133 n.88 (Del. Ch. 2009); *see also In re Yahoo! Inc. S'holder Derivative Litig.*, 153 F. Supp. 3d 1107, 1120 (N.D. Cal. 2015) (allegations "that the Yahoo Directors 'signed' or were involved in 'reviewing' the disclosures at issue" were "[c]onclusory" and "do not excuse demand under Delaware law").

For scienter, "[a] determination of whether the alleged misleading statements or omissions were made with knowledge or in bad faith requires an analysis of the state of mind of the individual director defendants." *In re Citigroup*, 964 A.2d at 134. The Shareholders contend that the Directors knew the statements were false because of their "intentional, knowing and persistent failure to nominate any black director candidates to Danaher's Board." Pls.' Opp'n at

---

[7] Most of the statements the Shareholders cite are also of the type that—at least in other contexts—courts consider not actionable. Take the statement "[w]e're passionate about recruiting, developing and retaining the most talented and diverse team possible." Compl. ¶ 54 (cleaned up). Because it is not "capable of objective verification," it is hard to see how it can be false or misleading. *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 109 (D.C. Cir. 2015) (cleaned up) (analyzing securities claims).

28.  But that the Directors did not nominate any African Americans to the Board does not mean that the alleged statements were false.  And even if they were, such accusations against the Directors as a group do not satisfy the demand futility requirement.  *See, e.g.*, *Hack v. Wright*, 396 F. Supp. 3d 720, 741 (S.D. Tex. 2019) ("[G]roup allegations are insufficient to excuse demand.  Under Delaware law, a plaintiff must plead with particularity the reasons for excusing demand as to each director individually."); *In re Citigroup*, 964 A.2d at 134 (explaining that "broad group allegations about the director defendants" were insufficient because "[a] determination of whether the alleged misleading statements or omissions were made with knowledge or in bad faith requires an analysis of the state of mind of the individual director defendants").  Without specific allegations for each Director, the Court cannot find that they face a substantial likelihood of liability.  *See In re Citigroup*, 964 A.2d at 134.

**3.**

The Shareholders also seem to suggest that the Directors have failed to maximize shareholder wealth.  *See, e.g.*, Pls.' Opp'n at 13–15.  They rely heavily on studies showing that companies with more diversity generally (and more diverse boards) earn higher profits.  *See, e.g.*, Compl. ¶¶ 46–51.  The Court construes the Shareholders' filings as arguing that the false statements have injured shareholder wealth, not that the failure to maximize shareholder wealth is a separate alleged breach.  *See, e.g.*, Pls.' Opp'n at 10–11 ("Rather than promote shareholder wealth, defendants are injuring it" through "unlawful misrepresentations and omissions").

If the Shareholders did intend to raise such a standalone breach claim, it would fail.  True, a director's fiduciary duty can encompass earning profit.  *See, e.g.*, *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 20 (Del. Ch. 2013) ("Directors of a Delaware corporation owe fiduciary duties to the corporation and its stockholders which require that they strive prudently

and in good faith to maximize the value of the corporation for the benefit of its residual claimants."); Pls.' Opp'n at 9, 15–16, 36. But the Court agrees with the Directors that "neither the duty of care nor the duty of loyalty binds directors to any single course of profit-maximizing action." Defs.' Reply at 19. The Shareholders cite no authority to the contrary. In fact, Delaware law grants directors substantial leeway to make business decisions and act in a corporation's best interest. *See, e.g.*, *Brehm*, 746 A.2d at 264 ("Irrationality is the outer limit of the business judgment rule." (cleaned up)); *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971) ("A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose. A court under such circumstances will not substitute its own notions of what is or is not sound business judgment.").

The Shareholders' assertion that profit maximization is a corporation's only purpose, *see* Pls.' Opp'n at 9–10, is also surprising, given their prayer for relief. To be sure, until recently, profit maximization was widely recognized as the sole goal of corporations. *See* Milton Friedman, *A Friedman Doctrine – The Social Responsibility of Business is to Increase its Profits*, N.Y. Times, Sept. 13, 1970, at SM17; *but see Business Roundtable Redefines the Purpose of a Corporation to Promote 'An Economy That Serves All Americans'*, Business Roundtable (Aug. 19, 2019), https://www.businessroundtable.org/business-roundtable-redefines-the-purpose-of-a-corporation-to-promote-an-economy-that-serves-all-americans. But among other things, the Shareholders ask that the Court order Danaher to "[i]nvest $150 million in economic and social justice programs for the African American community designed to address historical racial disparities" and "[f]inance 100 education scholarships valued at $100,000 each for K-12 African American students annually at partner schools located in the communities in which the Company

does business and/or maintains its headquarters."  Compl. at 47.  Plaintiffs must think just the opposite—that corporations need to promote certain values, despite the costs.

In sum, the Shareholders have failed to plead that the Directors face a substantial likelihood of liability for breach of fiduciary duty.  Pre-suit demand is therefore not futile as to this claim.

## B.

The Shareholders also argue that they did not have to make demand because the Directors face liability for unjust enrichment, their second claim.  *See* Pls.' Opp'n at 36.  Their Complaint alleges that "Defendants were unjustly enriched by their receipt of compensation while breaching their fiduciary duties owed to Danaher."  Compl. ¶ 107.

The Directors argue that, under Delaware law, if demand is not futile as to the Shareholders' fiduciary duty claim, it is not futile as to their unjust enrichment claim either.  *See* Defs.' Mot. at 29.  The Shareholders do not provide contrary authority.  *See* Pls.' Opp'n at 29–30, 35–37.  So the Shareholders' unjust enrichment claim will be dismissed under Rule 23.1 too. *Accord Hack*, 396 F. Supp. 3d at 744–45 (finding demand not excused for an unjust enrichment claim "for the same reasons" that demand was not excused as to a fiduciary duty claim because plaintiff provided no authority to counter defendants' citations suggesting that "claims for unjust enrichment and gross mismanagement are considered duplicative of claims for breach of fiduciary duty"); *Calma on Behalf of Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 592 (Del. Ch. 2015) (finding an unjust enrichment claim "duplicative of" a fiduciary duty claim at the motion-to-dismiss stage because "there is no alleged unjust enrichment separate or distinct from the alleged breach of fiduciary duty: if Defendants did not breach their fiduciary duties . . . then Defendants could not have been unjustly enriched"); *Hughes v. Xiaoming Hu*, No. CV 2019-

0112-JTL, 2020 WL 1987029, at *18 (Del. Ch. Apr. 27, 2020) (finding that the demand futility analysis for an unjust enrichment claim "necessarily treads the same path as" the futility analysis for a breach of fiduciary duty claim).

In any event, the Shareholders' unjust enrichment claim would likely independently fail. *See* Defs.' Mot. at 29–30. To make out such a claim, a plaintiff must allege facts showing "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). The Shareholders argue that the Directors were unjustly enriched by receiving compensation, but they do not explain how the compensation is tied to the alleged misconduct or whether the Directors performed compensable services for Danaher. *See* Pls.' Opp'n at 29–30, 36. They have thus failed to sufficiently allege a "relation between" the Directors' compensation and their allegedly wrongful acts. *Nemec*, 991 A.2d at 1130; *cf. Taylor v. Kissner*, 893 F. Supp. 2d 659, 673–74 (D. Del. 2012) (rejecting theory "that paying the salaries and standard fees of officers and directors who commit breaches of fiduciary duty constitutes" waste and unjust enrichment because the plaintiff "has not properly alleged any breach of fiduciary duty or any other theory providing a factual basis to conclude that the compensation received by each Defendant was paid without justification").

## C.

Finally, the Shareholders argue that they need not make a demand because the Directors face a substantial likelihood of liability as to their claim brought under § 14(a) of the Exchange Act. Section 14(a) makes it "unlawful for any person . . . to solicit any proxy" in violation of SEC rules. 15 U.S.C. § 78n(a). Exchange Act Rule 14a-9 then states that

> [n]o solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.

17 C.F.R. § 240.14a-9(a).

"It is well settled that a private plaintiff bringing a claim under § 14(a) or Rule 14a–9 must allege that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation was an essential link in the accomplishment of the transaction." *SEC v. Brown*, 740 F. Supp. 2d 148, 166 (D.D.C. 2010) (cleaned up). The Shareholders challenge these assertions in Danaher's 2016–2020 proxy statements:

- Reflecting our continued commitment to diversity and inclusion, we've trained more than 3,000 managers globally on how to build inclusive and diverse teams and leaders . . . .
- The Board does not have a formal or informal policy with respect to diversity but believes that the Board, taken as a whole, should embody a diverse set of skills, knowledge, experiences and backgrounds appropriate in light of the Company's needs, and in this regard also subjectively takes into consideration the diversity (with respect to race, gender and national origin) of the Board when considering director nominees. The Board does not make any particular weighting of diversity or any other characteristic in evaluating nominees and directors.
- As part of its process for identifying and evaluating directors and director nominees and ensuring an appropriate range of backgrounds and expertise, our Board actively considers Board refreshment. Supported by the Nominating and Governance Committee, the Board seeks to thoughtfully balance the knowledge and experience that comes from longer-term Board service with the fresh ideas, energy and new domain expertise that can come from adding new directors.[8]

---

[8] The Directors argue that the Shareholders' challenges to all but one of the proxy statements are time barred. Defs.' Mot. at 36. The Court need not address this challenge because the Shareholders' § 14(a) claim—as to all proxy statements—fails for other reasons. But the Directors are likely right. The parties agree that a one-year statute of limitations and three-year statute of repose applies to § 14(a) claims. *See id.*; Pls.' Opp'n at 34. The Directors point out that the Shareholders would have been aware of facts underlying their § 14(a) claim when the proxy statements were filed, which would mean that the Shareholders could only challenge the 2020 proxy statement. Defs.' Mot. at 36. Indeed, the Shareholders themselves argue that the lack of African Americans on the Board was an obvious problem of which the Directors must have been aware. *See, e.g.*, Pls.' Opp'n at 23 (stating that the Directors "knew their diversity statements were materially false because when made Danaher's Board did not include a single

*See* Compl. ¶¶ 54, 60–61 (cleaned up). They claim that the proxy statements "omitted material facts"—specifically, that "Defendants were causing Danaher to exclude African American candidates from the pool of candidates for nomination to the Danaher Board and/or the senior executive leadership team, and that Defendants were not committed to true diversity throughout Danaher's ranks, including in the boardroom." *Id.* ¶ 111.

The Directors argue that the Shareholders have failed to plead with particularity that the proxy statements challenged were "an essential link in the accomplishment of the transaction." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970); Defs.' Mot. at 30–32. The Court agrees.

The Shareholders contend that the proxy statements "were an essential link in Danaher shareholders following the Company's recommendation to re-elect Defendants to the Danaher Board and approve the executive pay packages." Compl. ¶ 113. This harmed Danaher, the Shareholders contend, because shareholders were "unaware of the defendants' disdain for ethnic board diversity," and "[s]ignificantly lower profitability and dimmer prospects are the realities for less diverse firms." Pls.' Opp'n at 31–32.

But "[c]ourts have . . . regularly dismissed Section 14(a) claims based on the election of directors because the losses are indirect." *In re The Home Depot, Inc. S'holder Derivative Litig.*, 223 F. Supp. 3d 1317, 1331 (N.D. Ga. 2016). Consider *General Electric Company v. Cathcart*, in which the plaintiff argued that "the misleading proxy statements served as 'an essential link' in the transactions which caused General Electric to lose money; the proxy statements allowed the [directors] to retain their positions on the board, thus ensuring that they could continue to mismanage the company." 980 F.2d 927, 933 (3d Cir. 1992). The Third Circuit explained that

―――――――――――――――
male or female director who is black"). Presumably, it would have been obvious to the Shareholders, too.

"this is precisely the sort of claim that courts have repeatedly found insufficient to satisfy the transaction causation requirement." *Id.*

The court reasoned that "the mere fact that omissions in proxy materials, by permitting directors to win re-election, *indirectly* lead to financial loss through mismanagement will not create a sufficient nexus with the alleged monetary loss." *Id.* "Rather," the court explained, "damages are recoverable under Section 14(a) only when the votes for a specific corporate transaction requiring shareholder authorization, such as a corporate merger, are obtained by a false proxy statement, and that transaction was the direct cause of the pecuniary injury for which recovery is sought." *Id.*; *see also Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 797 (11th Cir. 2010) (following *Cathcart* and dismissing proxy solicitation claims because "the damages suffered by the shareholders were caused not by the policies that they approved via proxy, but by management's failure to follow those policies").

So too here. The Shareholders' causation theory is as follows: the misleading proxy statements caused the election of the Directors, who then failed to nominate an African American director, which harmed the company because companies with less diverse boards are less profitable. *See, e.g.*, Pls.' Opp'n at 30–34. Under the Shareholders' theory, the election itself did not harm the company—the Directors' failure to nominate an African American director did. The proxy statements thus could not have been an "an essential link in the accomplishment of the transaction" that caused harm. *Mills*, 396 U.S. at 385.

The Shareholders' only response is that they have alleged what the plaintiff in *Cathcart* did not—"that the director elections facilitated by the misleading proxies are the loss causing transaction." Pls.' Opp'n at 33–34. But the Court finds this argument untenable, especially given that the Shareholders agree with the Directors that "the essential link requirement is

established when the proxy statement at issue *directly authorizes* the loss-generating corporate action." *Id.* at 30 (cleaned up and emphasis added). The proxy statements at issue did not directly cause the non-nomination of a black director.[9]

The Shareholders' cases are also distinguishable because the alleged harm to the company in these cases was more directly tied to the election of directors. Take *In re Zoran Corporation Derivative Litigation*, which concerned alleged backdating of stock options. 511 F. Supp. 2d 986, 995 (N.D. Cal. 2007). While the plaintiff there essentially argued "that the directors used the proxy solicitations to maintain their positions on Zoran's board," shareholders in that case also "authorized the stock-option plans under which the allegedly-backdated options were granted." *Id.* at 1016. Thus, "[w]ith each election, the board could continue to grant backdated stock options to itself and Zoran executives." *Id.*; *see also In re Maxim Integrated Prod., Inc., Deriv. Lit.*, 574 F. Supp. 2d 1046, 1066 (N.D. Cal. 2008) (explaining that the complaint alleged that defendants "issued proxy statements requesting votes for their election as directors and for approval of various Stock Plans"). Even if these cases do provide some support for the Shareholders' theory, *see, e.g.*, *In re Fossil, Inc.*, 713 F. Supp. 2d 644, 655 (N.D. Tex. 2010) (finding sufficient plaintiffs' allegation, among others, that "the actions of the defendants were the proximate cause of the backdating, and the harm that befell Fossil from its directors would not have occurred but for the directors' ability to maintain their positions on the Board by

---

[9] If the Shareholders argue that the election of the Directors was the challenged transaction because the Directors themselves are not diverse enough, that theory also fails. To begin, the Shareholders did not clearly present this theory in the Complaint; and they cannot amend their Complaint through an opposition brief. *Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 160 n.7 (D.D.C. 2014) ("It is well settled law that a plaintiff cannot amend his or her complaint by the briefs in opposition to a motion to dismiss."). It is also unclear how the challenged proxy statements would have misled shareholders into electing non-diverse directors when shareholders could evaluate for themselves the Directors' diversity. *See* Defs.' Reply at 23–24.

false and misleading proxies" (cleaned up)), the Court finds the Directors' authority more persuasive.

The Shareholders also face other problems. For example, they have not alleged particularized facts showing that the challenged statements were false or misleading. While the Shareholders claim that the Directors omitted that they "were causing Danaher to exclude African American candidates" and that they "were not committed to true diversity throughout Danaher's ranks," Compl. ¶ 111, these allegations are insufficient. These are merely "conclusion[s] unsupported by particularized facts." *Klein v. Ellison*, No. 20-CV-04439-JSC, 2021 WL 2075591, at *4 (N.D. Cal. May 24, 2021) (finding conclusory an argument that "the Board has never in good faith actively sought minority candidates" (cleaned up)); *see also Ocegueda on behalf of Facebook v. Zuckerberg*, No. 20-CV-04444-LB, 2021 WL 1056611, at *7 (N.D. Cal. Mar. 19, 2021) (finding plaintiff's arguments that a board omitted facts that it "was not committed to diversity, never wanted minority candidates, and wanted minorities to be seen and not heard" were "not facts" but "conclusions").[10]

The Complaint thus fails to allege particularized facts showing that the Directors face a substantial threat of personal liability as to their § 14(a) claim. The Shareholders have therefore failed to sufficiently allege demand futility.

---

[10] Because the Court finds the Shareholders' allegations deficient on other grounds, it need not address the Directors' argument that the Shareholders have failed to plead the Directors' culpability with particularity. Defs.' Mot. at 34–36. The Directors argue, and the Shareholders do not appear to dispute, that the heightened standard from the Private Securities Litigation Reform Act ("PSLRA") would apply. *See id.* at 35; Pls.' Opp'n at 30–34 (not addressing the PSLRA). Even under a negligence standard—which both parties agree (at least for resolving this motion) would govern, Defs.' Mot. at 34–35; Pls.' Opp'n at 31 n.30—it is not clear the Shareholders have met their burden, *cf. In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000) ("[A] Section 14(a) plaintiff must plead with particularity facts that give rise to a strong inference of negligence.").

## IV.

In conclusion, the Shareholders have not alleged demand futility with particularity. They have not shown that the Directors are interested—that is, face a substantial likelihood of personal liability—as to any of their three claims. The Shareholders were thus required to make demand on Danaher's Board, but they did not.[11] Courts facing similar shareholder derivative actions have reached like conclusions. *See Klein*, 2021 WL 2075591, at *1 (addressing plaintiffs' argument that "Oracle has failed to meaningfully diversify its Board of Directors, and has discriminatory hiring and promotional practices" and finding that they "have not sufficiently pleaded demand futility"); *Ocegueda*, 2021 WL 1056611, at *1 (considering plaintiff's challenge to "Facebook's alleged lack of diversity (on its board and executive team, and in its workplace)" and determining that she did "not plausibly plead futility"). This Complaint cannot survive.

---

[11] Because the Court dismisses the Complaint for failure to plead demand futility, it need not consider whether the Shareholders' Complaint fails to state a claim under Rule 12(b)(6). *See, e.g.*, *Hutton v. McDaniel*, 264 F. Supp. 3d 996, 1025 (D. Ariz. 2017) (denying as moot defendants' 12(b)(6) motion because the Court found "that demand was required"); *In re Polycom, Inc.*, 78 F. Supp. 3d 1006, 1021 (N.D. Cal. 2015) (same). But as another court has pointed out, where plaintiffs seem to "repeat[] verbatim the underlying claim . . . that forms the basis of their demand futility claim," the demand futility analysis would "appl[y] with equal force" in the Rule 12(b)(6) context. *In re Yahoo!*, 153 F. Supp. 3d at 1126. That would be the case here. Because the Shareholders "failed to show" a substantial likelihood of liability to excuse demand as to each of their three claims, the Court would likely "conclude[] that [they] fail to state a claim" "for many of the same reasons." *Id.*

For these reasons, Defendants' Motion to Dismiss will be granted in part, and Plaintiffs' Complaint will be dismissed.[12]  A separate Order will issue.


Dated: June 28, 2021                                    _____
                                                        TREVOR N. McFADDEN, U.S.D.J.

---

[12] The Directors argue for dismissal with prejudice.  *See* Defs.' Mot. at 38.  But the Court finds that a dismissal without prejudice is more appropriate, given the high standard for the alternative. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) ("A dismissal *with prejudice* is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." (cleaned up)); *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 131 (D.C. Cir. 2012) (explaining that "the standard for dismissing a complaint with prejudice is high" and that it "is the exception, not the rule, in federal practice" (cleaned up)).